```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
                              LAREDO
```

```
UNITED STATES OF AMERICA,     )
                              )
      Plaintiff,              )     Criminal Action No.
                              )        5:11-CR-11-S-02
v.                            )    (Civil Action No. 12-CV-78)
                              )
GUADALUPE SALAZAR TOVAR,      )
                              )
      Defendant.              )    MEMORANDUM OPINION & ORDER
```

                    **    **   **    **    **

Defendant Guadalupe Salazar-Tovar ("Salazar-Tovar") having filed a timely motion to vacate sentence pursuant to 28 U.S.C. § 2255. The government having filed a response to the same, and the Court being advised,

**IT IS ORDERED** that Salazar-Tovar's motion be, and the same hereby is, **DENIED** for the reasons which follow.

## I.
## JURISDICTION

Salazar-Tovar seeks § 2255 relief from the amended judgment of conviction and sentence imposed by the district court on May 26, 2011 (D.E. 76 (Hood, V.J.)).

## II.

## STATEMENT OF THE CASE

**A. Course of Proceedings and Disposition**

On January 19, 2011, Salazar-Tovar and Eliu Rivera-Mendez were charged by a federal grand jury in the Laredo Division of the Southern District of Texas, in a six count superseding indictment, with illegal possession of a machine gun, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2) (count one); possession of firearms by an alien illegally and unlawfully in the United States, in violation of 18 U.S.C. §§ 922(g)(5)(A), 924(a)(2) (count two); smuggling goods from the United States, in violation of 18 U.S.C. §§ 554 and 2 (count three); conspiracy to smuggle goods from the United States, in violation of 18 U.S.C. §§ 554, 371, 2, (count four); attempt to export hand grenades from the United States, in violation of 18 U.S.C. § 554 (count five); and conspiracy to smuggle goods from the United States, in violation of 18 U.S.C. §§ 554, 371 and 2 (count six).

On March 14, 2010, pursuant to a plea agreement with the government, Salazar-Tovar entered a plea of guilty to count five of the indictment (D.E. 49, 51, 52, 57). As part of the plea agreement, Salazar-Tovar agreed to waive his right to appeal the sentence and to collaterally attack his conviction and sentence, including filing a § 2255 Motion (D.E. 51).

On May 26, 2011, the undersigned sentenced Salazar-Tovar to serve 46 months of imprisonment, followed by three years of supervised release.(D.E. 76).  Consistent with his obligations

in the plea agreement, Salazar-Tovar did not appeal. See D.E. 75 (Notice of Non-Appeal). Inconsistent with his plea agreement, he filed the instant § 2255 motion on May 18, 2012 (D.E. 85).

B. **Statement of Facts Underlying the Conviction and Sentence**

1. Offense conduct.

The plea agreement Salazar-Tovar entered into with the Government contained the following "Factual Basis for Guilty Plea":

> 15. Defendant is pleading guilty because he/she is guilty of the charges contained in COUNT FIVE of the Superseding Indictment, and the facts set forth by the United States meet the elements of the crime he/she is pleading guilty to on this date. If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt. The following facts, among others, would be offered to establish the defendant's guilt:
>
> On November 30, 2010, a confidential informant (hereinafter "CI") advised agents with the United States [B]ureau of Alcohol, Tobacco, [F]irearms and Explosives (ATFE) that defendant ELIU RIVERAMENDEZ (hereinafter "RIVERA") had contacted the CI to tell him that "Lupe", later identified as defendant GUADALUPE SALAZAR-TOVAR (hereinafter SALAZAR), was interested in buying weapons. On the same day, the CI placed a consensually monitored phone call to "Lupe" who advised undercover agents (hereinafter UA), believing them to be illegal weapon suppliers, that he wanted to purchase Machine guns and hand grenades. Defendant SALAZAR placed a tentative order for eight (8) machine guns and twenty (20) hand grenades, pending his confirming with the "actual buyers."
>
> On December 2, 2010, Defendant SALAZAR confirmed the prior order for the weapons and agreed on a price of $10,400 (US). UA advised that they had thirty (30) hand grenades to sell if SALAZAR wanted to purchase instead of only the original twenty (20) hand

grenades. SALAZAR stated he would talk to the buyers to recommend buying the additional grenades. SALAZAR told UA that the weapons were to be crossed into Mexico.

On December 6, 2010, Defendant SALAZAR again confirmed the original purchase of eight (8) machine guns and twenty (20) hand grenades. On December 7, 2010, undercover agents with the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATFE) confirmed a meeting with defendants Eliu RIVERA-MENDEZ and GUADALUPE SALAZAR-TOVAR at their request to purchase machine guns and fragmentation grenades. Defendants traveled in SALAZAR's truck, with SALAZAR driving, to have a face-to-face meeting with the undercover agents who were posing as the weapons sellers. Defendant RIVERA exited the truck and entered the agents' car. SALAZAR remained in the truck. In the agents' car, RIVERA viewed and handled a fully automatic AR-type rifle in the presence of an UA, who confirmed to RIVERA that it was a fully automatic weapon, and also demonstrated to RIVERA how to manipulate the selector switch to full automatic. The defendant handled the weapon, and manipulated the selector switch. Defendant RIVERA was also shown a hand grenade for his inspection. After approving both weapons, RIVERA told UA that he had the $10,400 cash for the purchase. RIVERA returned to the truck where SALAZAR had remained, and then followed the UA's vehicle to a meeting place to conduct the actual weapons transaction.

At the meeting, the defendants delivered $10,400 cash to the agent for the eight (8) machine guns and twenty (20) M-67 hand grenades Unknown to the defendants, only four (4) of the delivered rifles were fully automatic and fully functioning machine guns. The other four (4) assault rifles were semi-automatic. Additionally, and unknown to the defendants, the hand grenades which were actually delivered were "prop" (non-functioning) devices. The defendants believed, nevertheless, that all eight (8) rifles were fully automatic and that the twenty (20) hand grenades were fully-functioning destructive devices. At the time of purchase, the automatic weapons and the hand grenades were again displayed and handled by both defendants. During the purchase, the defendants stated that the

weapons were not for them but destined for Mexico, specifically to Nuevo Laredo. After taking physical possession of the weapons, Defendants were arrested after attempting to flee.

After rights advisement and waiver, both Defendants admitted that they purchased the four (4) machine guns, the four (4)semi-automatic assault weapons believing them to be fully automatic machine guns, and the prop hand grenades, believing them also to be fully functioning hand grenades, with the intent of transporting them into Mexico. SALAZAR stated that a Mexican truck driver was going to smuggle the weapons into Mexico after receiving them from the Defendants, and would pay $200 to each defendant. RIVERA admitted that he expected to be paid about $500 for helping in the transaction, and that he knew that the weapons were going to be smuggled into Mexico.

One of the fully automatic machine guns is identified as a Bushmaster .223 caliber, Model XM15-E2S, machine gun, with the serial number BFI424708. Defendants RIVERA and SALAZAR admitted to paying the UC agents the $10,400 cash for the weapons. They also admitted that they were nationals and citizens of Mexico without permission or authority to be or enter the United States.

An inventory of SALAZAR's truck resulted in the discovery of defendant's personal insurance paperwork from Pronto Insurance Agency with hand-written notes on the purchase on the reverse:

"20 pinas - 4000" which is translated as "20 grenades for $4,000".
"8 juetes - 6400 ... 10400" which is translated as "8 machine gunsfor $6,400 total $10,400".

The defendant judicially confesses and admits that on December 7, 2010, he did fraudulently and knowingly attempt to export and send from the United States to the Republic of Mexico twenty (20) hand grenades (military designation M-67), contrary to the laws and regulations of the United States, to wit, the Arms Export Control Act, Export of Arms and Munitions, and did purchase said M-67 hand grenades prior to exportation, knowing the same to be intended for

> exportation contrary to the laws and regulations of the United States.

(D.E. 51, p. 7-11 ). Salazar-Tovar acknowledged that these facts were true by signing the plea agreement. (D.E. 51, p. 14).

### 2. Plea Agreement and Rearraignment

In addition to the factual basis Salazar-Tovar agreed to, in the Plea Agreement, inter alia, he expressly waived his right to collaterally attack his conviction or sentence in a 2255 motion, as follows:

> 8. Defendant is aware that Title 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. The defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined. Additionally, the Defendant is aware that Title 28 U.S.C. § 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final. Defendant waives the right to contest his/her conviction or sentence by means of any post-conviction proceeding.

(D.E. 51, p. 4). Salazar-Tovar signed the Plea Agreement, as well as the "Plea Agreement Addendum," which stated:

> I have consulted with my attorney and fully understand my rights with respect to the Superseding Indictment pending against me. My attorney has fully explained and I understand all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms.

(D.E. 52, p.2).

At the rearraignment hearing, Salazar-Tovar executed a waiver of the right to plead guilty before a United States

District Judge as well as a consent to proceed before a United States Magistrate Judge. (D.E. 49, p. 1). In open court, Salazar-Tovar agreed to plead guilty to count five of the Superseding Indictment, the Government summarized the written plea agreement, the Court explained that the district court may consult the sentencing guidelines in determining his sentence and explained the range of punishment. (D.E. 57). The Magistrate Judge found that Salazar-Tovar who had consented orally and in writing to enter the guilty plea before the Magistrate Judge, "fully understands the nature of the charges and penalties," and "understands his Constitutional and statutory rights and wishes to waive those rights." (D.E. 57, p. 2). The Magistrate also found that Salazar-Tovar's plea "is made freely and voluntarily," and that he "is competent to enter this plea of guilty," and that "there is an adequate factual basis for this plea." (D.E. 57, p. 2). The Magistrate Judge recommended that the district court accept the guilty plea and enter final judgment of guilt against the
defendant. Id. In his Report and Recommendation to the district court, the Magistrate Judge noted that "the parties may file objections to this Report and Recommendation . . . within fourteen days after being served with a copy of the Report and Recommendation. (D.E. 57, p. 2). Salazar-Tovar did not file any objections.

In addition to the Magistrate Judge's Report and Recommendations, the transcript of the hearing reveals that Salazar-Tovar acknowledged in open court that he understood the charges against him and pleaded guilty. (D.E. 93, p. 7). He also acknowledged that the signature on the written Plea Agreement was his, that he had reviewed the document with his attorney before he signed it, and swore under oath that everything in the written plea agreement was true and correct. (D.E. 93, p. 7). He testified that he understood that the maximum penalty for the charge in count five is not more than 10 years in prison. (D.E. 93, p. 10). He testified that he understood that as he is a native and citizen of another country (Mexico), when he is finished serving his sentence he will be formally deported, excluded, or removed back to his home country. (D.E. 93, p. 11). The Magistrate Judge reviewed the agreements in the Plea Agreement, including that Salazar-Tovar agrees to give up his right to appeal and his right to come back later and complain about his detention, sentence, or conviction -"known as a post-conviction collateral attack." The defendant acknowledged that that is what he agreed to in the plea agreement, that is, that "[He] won't be able to come back and complain about the sentence. [He] cannot complain about this case. That is part of [his] agreement." (D.E. 93, p. 13 – 14). He also testified that nobody made any other promises to him

other than those in the plea agreement. (D.E. 93, p. 17). He testified that he understood that he was giving up his right s to a trial. (D.E. 93, p. 19). After the Magistrate Judge reviewed again the consequences of a guilty plea, and the written plea agreement, including specifically the waiver of the right to appeal, the defendant testified that he still wanted to enter a plea of guilty to count five in the Superseding Indictment. (D.E., p. 20). After the prosecutor read the factual basis in the plea agreement, Salazar-Tovar said he had no corrections to what the prosecutor said. (D.E., p. 20). The Magistrate Judge accepted the defendant's guilty plea and advised that he would report and recommend to Judge Kazen that he find the defendant guilty and that the defendant be sentenced accordingly. The defendant said that he had no questions. (D.E., p. 28).

### 3. **The Sentence**.

Prior to sentencing, the probation office prepared a presentence report ("PSR"), which calculated the Guideline imprisonment range based on a total offense level of 23 and a criminal history category of I to be 46 to 57 months, and the statutory maximum term of imprisonment to be 10 years, pursuant to 18 USC § 544. (PSR ¶¶ 75, 76).

At sentencing, the undersigned sitting by designation sentenced Salazar-Tovar to 46 months in prison and dismissed the

remaining four counts in the Superseding Indictment on the government's motion. (D.E. 94, p. 11). Salazar-Tovar's counsel stated that he and Salazar-Tovar were "tendering our Notice of Non-Appeal at this time, even though he did waive it." (D.E. 94, p. 12).

## III.

## ISSUES

### I. Primary Issue pertaining to the Plea Agreement Waiver.

Whether Salazar-Tovar is barred from bringing any of his claims as a result of his waiver of the right to contest his conviction or sentence by means of any post-judgment proceeding?

### II. Supplemental Issue Raised by Salazar-Tovar.

Salazar-Tovar alleges that counsel was constitutionally ineffective because he failed to "let the court know that [Salazar-Tovar] was well over qualify [sic] to received a downward departure to the fast-track early disposition program" or argue that Salazar-Tovar's sentence should reflect the disparity that is created between fast-track and non-fast-track districts.

## IV.

## Specific Enforce Of The Plea Agreement

The government seeks specific enforcement of the plea agreement it reached with Salazar-Tovar. Salazar-Tovar's motion asserts an ineffective assistance of counsel claim. A liberal reading of Salazar-Tovar's § 2255 motion discloses that Salazar-Tovar's allegation regarding his sentence and dissatisfaction with counsel, falls within the scope of his § 2255 waiver

because, on its face it is not a direct challenge to the voluntariness of his plea and, therefore, the waiver. *See United States v. White*, 307 F.3d 336, 343-44 (5th Cir. 2002). On the other hand, an ineffective assistance claim survives a § 2255 waiver only when the claimed [ineffective] assistance directly affected the validity of that waiver or the plea itself. *Id.* In this case, Salazar-Tovar's claimed ineffective assistance ground does not directly affect the validity of the waiver or the plea. Thus, the government requests specific performance of the plea agreement. Salazar-Tovar voluntarily waived his right to bring this instant action in his plea agreement and at his rearraignment. Salazar-Tovar entered into a plea agreement where, in exchange for the government's promise to not oppose the 2 acceptance of responsibility points and to move for the third point consistent with the requirements of USSG §3E1.1(b), he agreed to a broad and unequivocal waiver of collateral relief as quoted above.

During Salazar-Tovar's rearraignment he testified under oath that he understood the rights he was giving up by pleading guilty, including the consequences of the waiver of appellate rights and his right to "appeal" his conviction and sentence under the provision of 28 U.S.C. § 2255.

Salazar-Tovar's sworn statements in open Court are entitled to a strong presumption of truthfulness. *United States v.*

*Lampaziane*, 251 F.3d 519, 524 (5th Cir. 2001)(citing *Blackledge v. Allison,* 431 U.S. 63, 74 (1977)). The Fifth Circuit gives "great weight to the defendant's statements at the plea colloquy." *United States v. Cothran*, 302 F.3d 279, 283-84 (5th Cir. 2002). Salazar-Tovar's sworn statements preclude the relief he seeks in this proceeding.

Salazar-Tovar knew the potential punishment he faced. He also stated that his plea was knowing and voluntary. Salazar-Tovar testimony was abundantly clear that his decision to plead guilty was voluntary and that he understood the potential punishment.

Under the terms of the plea agreement, Salazar-Tovar shall be held to the bargain to which he agreed. He knowingly and voluntarily waived his right to file a § 2255 motion. Accordingly, Salazar-Tovar's § 2255 motion fails, in its entirety, because he specifically waived the right to file such a motion.

The record supports the conclusion that:

(1) the plea agreement and waiver were knowing and voluntary;

(2) the waiver provision in the plea agreement is enforceable and supports the government's motion for summary judgment; and,

(3) the waiver and the record in this case preclude Salazar-Tovar from asserting the ineffective assistance of counsel claim in his current motion.

## V.

## ALTERNATIVE MOTION TO DISMISS

Alternatively, the government urges dismissal of the § 2255 motion with prejudice as the record shows Salazar-Tovar is not entitled to relief.

An ineffective assistance of counsel allegation in a § 2255 motion is analyzed under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668(1984). *United States v. Willis*, 273 F.3d 592, 598 (5th Cir. 2001). To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both deficient and prejudicial. Id. This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. *United States v. Dovalina*, 262 F.3d 472, 474-75 (5th Cir. 2001). If the movant fails to prove one prong, it is not necessary to analyze the other one. *Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one."); *see also Carter v. Johnson*, 131 F.3d 452, 463

(5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

A claim of ineffective assistance of counsel is properly made in a § 2255 motion because it raises an issue of constitutional magnitude and, as a general rule, cannot be resolved on direct appeal. *United States v. Bass*, 310 F.3d 321, 325 (5th Cir. 2002) (citing *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992)). As *Strickland* cautions, scrutiny of counsel's performance must be highly deferential, lest it suffer "the distorting effects of hindsight." 466 U.S. at 689. Thecourt must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that a challenged action " 'might be considered sound trial strategy.' " *Id.*

"Fast track" programs allow certain defendants to plead guilty and to waive certain rights very early in the criminal process, in exchange for a motion by the government for downward departure pursuant to U.S.S.G. § 5K3.1.2 authorizes a reduction for fast-track programs, initially established in district courts along the southwestern United States in order to accommodate the large number of immigration cases, to offer defendants some form of sentence reduction in exchange for the

waiver of certain procedural rights. *See United States v. Rodriguez,* 523 F.3d 519, 526-27 (5th Cir. 2008).

Salazar-Tovar acknowledges that "immigration defendants" and "immigration offenses" as being the focus of fast-track benefits. However, he is not an "immigration defendant" who was convicted of an "immigration offense." Salazar-Tovar has not shown that his counsel was deficient in arguing for fast-track consideration in his case which involved attempting to smuggle machine guns and grenades from the United States into Mexico. United States v. Kimler,167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

Likewise, Salazar-Tovar's claims that counsel was constitutionally ineffective by failing to argue that the district court should exercise its discretion to impose a sentence that would minimize the sentencing disparity created by fast track programs in some sentencing jurisdictions but not others, a district court is not required "to factor in, when sentencing a defendant, the sentencing disparity caused by early disposition programs to prevent a sentence from being unreasonable." *United States v. Aguirre-Villa*, 460 F.3d 681, 683 (5th Cir.2006). It is hard to argue sentencing disparity

between districts with a fast track program and those without one where the defendant, like Salazar-Tovar, was not eligible for fast track consideration because he was not convicted of an immigration offense.  Again, counsel's performance was not constitutionally deficient for failing to raise a meritless claim. *See Sones v. Hargett*, 61 F.3d 410, 415 n. 5 (5th Cir. 1995).

## VII.

## CONCLUSION

Accordingly, the government's motion for summary judgment or, in the alternative, to dismiss shall be, and the same hereby is, **GRANTED.**

The defendant's motion to vacate sentence under 28 U.S.C. § 2255 shall be, and the same hereby is, **DENIED with prejudice.**

**No certificate of appealability shall issue as reasonable jurists would not differ on the outcome of this case.**

This the 10th day of August, 2012.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge